IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Sandra Obermeier, ) | |
| ) | Civil Action No. 6:04-22804-RBH-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Bonitz, Inc., and Bonitz ) | |
| Contracting Co., Inc., ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendants' separate motions for summary judgment. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**PROCEDURAL BACKGROUND**

The plaintiff filed this action on October 28, 2004, alleging claims of race discrimination in violation of Title VII and 42 U.S.C. §1981 ("Section 1981), for sexual harassment in violation of Title VII, for retaliation in violation of Title VII and Section 1981, and for violation of the Fair Labor Standards Act ("FLSA"). She seeks relief from two defendants – Bonitz, Inc., and Bonitz Contracting Co., Inc. – separate corporations that she alleges "are a single and/or joint employer" (compl. ¶ 4).

On December 9, 2004, Bonitz Contracting Co., Inc. ("BCCI") filed an answer to the complaint in which it admitted that plaintiff had been its employee (BCCI ans. ¶ 5). On the same day, Bonitz, Inc. ("Bonitz") filed a motion to dismiss the complaint pursuant to Rule 12(b)(6) based upon its contention that the plaintiff had failed to allege facts

demonstrating an employment relationship between the plaintiff and Bonitz. This court recommended that the motion be denied, and the recommendation was adopted by the Honorable R. Bryan Harwell, United States District Judge, on May 5, 2005.

On September 6, 2005, defendants Bonitz and BCCI filed separate motions for summary judgment, and the plaintiff responded to the motions on September 19, 2005. The defendants filed replies on September 26 and 27, 2005.

## **FACTS PRESENTED**

Defendant BCCI is a subsidiary of defendant Bonitz. The plaintiff claims that BCCI and Bonitz were a single and/or joint employer of the plaintiff. The defendants argue that the plaintiff was employed solely by BCCI. The plaintiff, a white female, was hired in July 1999 and, for most of her employment, she worked as an administrative assistant to the Director of Purchasing David Marshall (pl. dep. 15). She would also fill in for the receptionist, Jataun Clark, a black female.

In March 2002, Clark and her cousin, Keo Harper, who did not work for the defendants, had lunch together at the office. The plaintiff was covering the receptionist duties during Clark's lunch break, but left the receptionist desk to assist one of the other administrative assistants with her computer. While the plaintiff was away from her desk, Clark and/or Harper called the receptionist desk from the lobby so they could laugh at the plaintiff as she hurried to answer the prank calls. The plaintiff complained to Clark's supervisor. Clark was told to apologize and was told her cousin was not allowed back in the building. The plaintiff testified in her deposition that she was satisfied with the supervisor's response to this incident; however, she thought Clark's apology was insincere (pl. dep. 29-33, 37; pl. aff. ¶ 14). She claims that while Clark was told not to allow Harper back in the office, Harper once came up to the switchboard where she was working and "laughed menacingly" at her (pl. aff.¶ 15). She also attributes two voice mails that she

2

received to Harper. According to the plaintiff, she could hear "black music" and people in the background on the calls (pl. dep. 42).

In early to mid-February 2003, the plaintiff complained to her supervisor, David Marshall, about the telephone calls. She complained to Bill Michel, the Human Resource Manager, about the calls by e-mail on February 19, 2003. The e-mail stated in pertinent part:

> I am being harassed by a black girl that works here and her cousin which does not work for Bonitz. I have went to her supervisor and to my supervisor and to my knowledge nothing has been done about the situation, they just act like it didn't happen. But I can't forget about it and have been very upset at the way I have been treated. I should not have to be harassed on my job.

(BCCI m.s.j., ex. H). Michel came to Greenville to investigate, and the plaintiff played one of the voice mails she had saved (pl. dep. 38, 42-44). The plaintiff complained to Michel that the only reason Clark had not been disciplined was because she was black and that if she were white she would have been disciplined or even terminated (pl. aff. ¶ 16; pl. dep. 128). Michel met with Clark and advised her that if Harper returned to the building again, she would face discipline up to and including termination (BCCI m.s.j., ex. S).

The plaintiff alleges that she was sexually harassed by several co-workers and supervisors. Her allegations consist of the following:

1. On August 18, 2000, Todd Griffin, a project manager, called the plaintiff a "ho" (BCCI m.s.j., ex. U). She also claims that Griffin made remarks about her clothing and breasts that she could not specifically recall and that he once called her a "stupid blonde" (pl. dep. 70-72).

2. Macon Clark, a vice-president of the company, "constantly ogled" her and made her uncomfortable. She claims he was always trying to look down her shirt (pl. aff. ¶ 9). She could not recall dates of any incidents involving Clark (pl. dep. 84).

3.  Ron Roberts, a salesperson, "always told [her] to wear tight shirts" (pl. aff. ¶ 10). She could not remember approximate dates of these alleged remarks (pl. dep. 85).

4.  Jerel Wolfe, the chief estimator, made comments about the plaintiff's breasts and would "howl" at her while holding his shirt out like breasts. He once told her that if her "'brains were as big as [her] boobs were, [she] could set up a project right'" (pl. aff. ¶ 5). Wolfe "propositioned" the plaintiff on three occasions by telling her that if she would sleep with him she would forget all about her husband (pl. aff. ¶ 6; pl. dep. 82). Wolfe told her once that after dark his penis got as large as his stomach (pl. aff. ¶ 6). The plaintiff stated this remark was made in front of Scott Vanvick, the profit center leader for the Greenville facility. The plaintiff repeated the remark to two men who worked for Wolfe and said that she was offended by the remark (pl. dep. 74).

5.  David Marshall, the plaintiff's supervisor, told the plaintiff on March 5, 2003, that he did not know how she could see her feet (pl. dep. 78). Marshall also made other comments about the plaintiff's weight, asking her how much more weight she was going to gain, and when she planned to lose some weight (pl. aff. ¶ 7).

The plaintiff admitted in her deposition that she sent several e-mails to various co-workers, including alleged harasser Wolfe, that contained off-color language and/or sexual content. These included a cartoon making fun of morbidly obese women in tight clothing; a picture of a woman in a tight-fitting t-shirt with the phrase "I WISH THESE WERE BRAINS" across the chest; a cartoon of a man swimming with a nude female below him under the water performing fellatio through a snorkel; and an "ebonics" version of the Ten Commandments (pl. dep. 125; BCCI m.s.j., ex. L-R).

At the time the plaintiff complained to Michel about Clark, she also complained about sexual harassment (pl. aff. ¶ 16). Michel asked for details and for the name of the harasser(s), but the plaintiff refused (Michel dep. 87). The plaintiff testified in her affidavit

4

that she was afraid she would lose her job if she identified the people who had harassed her, since some of the participants were managers (pl. aff. ¶ 12).

Vanvick testified that he began to have concerns in October 2002 about the financial outlook for BCCI for 2003 (Vanvick dep. 8, 15). According to Vanvick, the office's earnings were on target, but the "backlog," or sales of new business to be performed in the future, had fallen off substantially (Vanvick dep. 14-15). He spoke with Marshall in mid-December 2002, then again in January 2003, regarding the possibility of eliminating the plaintiff's position (Vanvick dep. 12-13, 17). When he received Marshall's evaluation of the plaintiff, Vanvick prepared the form computing her bonus and noted on the form that the plaintiff's "position will be phased out due to low backlog." The form is dated February 15, 2003 (Vanvick dep. 13, 23; BCCI m.s.j., ex. T).

In late February 2003, Vanvick saw Michel at a funeral. Vanvick told Michel that he intended to eliminate the plaintiff's position for economic reasons (Vanvick dep. 23, 49-50). Michel then told Vanvick that he had just received an e-mail from the plaintiff complaining about alleged discrimination and that it would be best not to terminate her employment until the claims were investigated (Michel dep. 42-43). Once Michel completed his investigation and submitted his report, Vanvick and Marshall met with the plaintiff on March 13, 2003, and told her that her job was being eliminated due to economic circumstances (pl. dep. 24, 120; Vanvick dep. 34-45). The plaintiff's position has not been filled (Marshall dep. 10). In the year following the plaintiff's termination, four other employees were let go for economic reasons, according to Vanvick (Vanvick dep. 20-22).

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

5

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.  Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).  Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## **ANALYSIS**

### *Bonitz' Motion for Summary Judgment*

Bonitz argues that it is entitled to summary judgment because it was not the plaintiff's employer and, therefore, it is not subject to liability under Title VII, Section 1981, or the FLSA.  A party may bring an employment discrimination claim against an entity other than the party's nominal employer by establishing joint-employer or single-employer status. *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 979-81 (4th Cir. 1987).  The Fourth Circuit Court of Appeals considers the following factors in determining whether a parent entity exercises sufficient control over a subsidiary entity for purposes of a joint employer determination:  (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership.  *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442 (4th Cir. 1999).

Bonitz is a holding company that has five separate subsidiary companies, one of which is BCCI (Stephen E. Lee aff. ¶ 4).  BCCI pays to Bonitz a "monthly corporate administration fee" – as do the other subsidiaries.  The defendants share the same human

7

resources function, the same accounting function, the same information services function, and the same corporate executive function (Lee aff. ¶ 5). Bill Michel, defendant Bonitz' Human Resources Manager, stated in his deposition that there was one human resources function that handled all of the employment and labor issues at Bonitz and its subsidiaries, including BCCI (Michel dep. 9).

With regard to centralized control of labor relations, the employee handbook issued to the plaintiff at the beginning of her employment, which contains all of the policies and procedures applicable to her employment, has "Bonitz" on the cover, and includes a section detailing the history of defendant Bonitz, Inc., but does not include the history of BCCI (pl. resp. Bonitz m.s.j., ex. 4). Further, the defendants utilize the same supervisory policy manual, which refers to Bonitz and its subsidiaries collectively as "the company" (pl. resp. Bonitz m.s.j., ex. 5). The layoff policy in the supervisory manual states that decisions regarding a layoff should involve the Chief Executive Officer of Bonitz and Bonitz' Human Resources Manager (pl. resp. Bonitz m.s.j., ex. 6). The plaintiff's paychecks were issued by "Bonitz Companies & Affiliates" (pl. resp. Bonitz m.s.j., ex. 7).

With regard to common management, as noted above, BCCI makes payments to Bonitz for "corporate executive services." The plaintiff notes that Michel testified that there was a single Board of Directors for Bonitz and its subsidiaries. Bonitz' chairman, Bill Rodgers, was the chairman for Bonitz and BCCI. Further, the highest-ranking individual at each of the subsidiaries reported to Bonitz President Tommy Banks (Michel dep. 10-12). With regard to common ownership, BCCI is a "100 percent wholly owned subsidiary of Bonitz, Inc." (Bonitz m.s.j. 4).

Based upon the foregoing, it appears to this court that summary judgment for Bonitz on the grounds that it was not the plaintiff's employer would be inappropriate.

8

***BCCI's Motion for Summary Judgment and***
***Bonitz' Alternative Motion for Summary Judgment***

The plaintiff alleges claims for hostile work environment, disparate treatment, and retaliation in violation of Title VII. Under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973), the allocation of proof is as follows: (1) the plaintiff-employee must first establish a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant-employer to articulate a legitimate non-discriminatory reason for its actions; and (3) if the defendant carries this burden, the plaintiff must then establish by a preponderance of the evidence that the reason articulated by the employer is a pretext to mask unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802-03).

In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because "[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 147 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519) (emphasis in original). However, the Court also stated that, under the appropriate circumstances, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id*. It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination. *See id.* at 147-48. Pretext analysis does not convert Title VII into a vehicle for challenging unfair – but nondiscriminatory – employment decisions. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989). Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion. *Ross*, 759 F.2d at 365.

9

***Sexual Harassment***

> To state a hostile work environment claim, [the plaintiff] must allege that: (1) she experienced unwelcome harassment; (2) the harassment was based on her gender . . . ; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.

*Bass v. E.I. Dupont de Nemours*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir.1998)).  Assuming there is evidence that the alleged harassment was motivated by her gender, the plaintiff's hostile environment claim still fails because the harassment was not sufficiently severe or pervasive to create an abusive atmosphere or to otherwise alter the plaintiff's conditions of employment.  In evaluating whether harassment is severe and pervasive so as to make it actionable under Title VII, the court "must examine the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Hopkins v. Baltimore Gas & Electric*, 77 F.3d 745, 753 (4th Cir. 1996) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

As argued by the defendants, the Fourth Circuit Court of Appeals has granted summary judgment despite acknowledging allegations, including the following, regarding a male coworker who acted at times as the plaintiff's supervisor:

- telling the plaintiff's supervisor in her presence that she should be "spanked every day," in response to which her supervisor laughed and agreed;
- constantly staring at her breasts and telling her how attractive she was; and
- installing a security camera pointed at her desk so that he could watch her.

*Singleton v. Dept. of Correctional Educ.,* 115 Fed. Appx.119, 120 (4th Cir. Nov. 17, 2004).  The offending conduct occurred approximately four times per week for over a year.  The

court concluded the behavior was not sufficiently severe and pervasive as to alter the conditions of her employment. *Id.* at 122.

In another case similar in frequency and severity to the instant case, the Fourth Circuit Court of Appeals found that the events alleged by the plaintiff were "simply insufficient to satisfy the requirement 'that the harassment was sufficiently severe or pervasive to create an abusive working environment.'" *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 772 (4th Cir. 1997). In that case, the female plaintiff claimed that one of her male coworkers told her, "We've made every female in this office cry like a baby ... [w]e will do the same to you ... [j]ust give us time, we will find your weakness." *Id.* at 768. Another coworker referred to his former female sales assistant as his "slave" and told the plaintiff that she too "would become the slave." *Id.* A sales representative, upon seeing a woman in a magazine who was "rather buxom and wearing a low-cut T-shirt," stated, "Why don't we have sales associates that look like that[?]" The area manager answered, "Yeah, really." *Id.* When a male coworker took her seat and started using her computer, the plaintiff protested, and the coworker stated, "Why don't you go home and fetch your husband's slippers like a good little wife, that's exactly what my wife is going to do for me." *Id.* at 769. In finding that the plaintiff had not established a hostile work environment claim, the court stated that "not all sexual harassment that is directed at an individual because of his or her sex is actionable. Title VII does not attempt to 'purge the workplace of vulgarity.'" *Id*. at 772.

In the instant case, the improper conduct alleged by the plaintiff that could be considered sex-based consists of (1) a project manager once calling her a "ho" and another time a "stupid blonde"; (2) a vice president of the company "ogling" her; (3) a salesperson "always telling her to wear tight shirts"; (4) the chief estimator making comments about her breasts, "howling" at her while holding his shirt out like breasts, telling her once that if her "'brains were as big as [her] boobs were, [she] could set up a project right,'" propositioning

11

her on three occasions by telling her that if she would sleep with him she would forget all about her husband, and telling her once that after dark his penis got as large as his stomach; and (5) the plaintiff's supervisor telling her once that he did not know how she could see her feet and making other comments about her weight. The events took place over a four-year period. Further, there is no evidence that the plaintiff's work performance suffered as a result of the alleged incidents of harassment. Viewing the evidence in a light most favorable to the plaintiff and considering the factors above, the conduct clearly is not sufficiently severe or pervasive as a matter of law. Accordingly, summary judgment should be granted as a matter of law.

### *Race Discrimination*

The plaintiff alleges that her termination was the result of race discrimination by the defendants, in violation of Title VII and Section 1981. She argues that while her employment was terminated due to an alleged downturn in the defendants' business, Clark, a less senior and lesser-performing employee who is black, was not terminated (pl. resp. BCCI m.s.j. 26). The plaintiff testified in her deposition that the defendants "should have let [the plaintiff] have [Clark's] job and gotten rid of [Clark] because she was out all the time and [the plaintiff] was at work on time every day" (pl. dep. 67).

In order to establish a *prima facie* case, she must prove each of the following elements: (1) she is a member of a protected class; (2) she was selected from the department, group, or territory for termination; (3) she was performing at a level substantially equivalent to the lowest level of those retained in the group or territory; and (4) the process of selection produced a residual work force of persons in the department, group, or territory containing some unprotected persons who were performing at a level lower than that at which the plaintiff was performing. *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1418 (4th Cir. 1991).

The defendants argue that the plaintiff was not selected for discharge from a larger group, but was instead selected without regard to her job performance or seniority level because her position was the most expendable (BCCI m.s.j. 23). The defendants point out that Marshall had performed his job without the presence of an administrative assistant for some 15 years prior to the plaintiff's arrival and has managed without an administrative assistant for nearly two and a half years since the plaintiff's position was terminated. In contrast, the other administrative assistant positions had been in place for decades. Further, the defendants claim that the receptionist position, which was held by Clark, was an "obvious necessity for a customer-oriented business" such as BCCI (BCCI m.s.j. 23).

The plaintiff contends that the first three elements are easily met. She argues that with regard to the fourth element, Clark, a black employee outside of the plaintiff's protected class, was objectively performing at a level below the plaintiff's performance. The plaintiff has not contended that Gail Richardson, the only other administrative assistant who is not white, should have been terminated in her place, but rather has limited her race discrimination claim to the argument that she should have been given Clark's job (pl. dep. 67-68). The plaintiff notes that when their performance evaluations for 2002 are compared, the plaintiff received a score of 98, and Clark received a score of 95 (pl. resp. BCCI m.s.j. 28). The defendants argue that the plaintiff is ignoring the distinction between the two jobs. Clark was a receptionist, and the plaintiff was an administrative assistant to the director of purchasing. Further, the defendants argue that the scores on the performance evaluations are not comparable because the two employees were in different jobs under different supervisors (pl. aff. ¶¶ 3, 14) (plaintiff supervised by David Marshall, and Clark supervised by Gail Richardson). The defendants also note that by the plaintiff's own admission she "hated" the receptionist job, and if she had been given the position, she would have left it as soon as she possibly could  BCCI m.s.j., ex. I). This court agrees with the defendants

13

that the comparison between the plaintiff's and Clark's evaluations is inherently pointless because they were being evaluated for performing different jobs under different supervisors.

Even assuming the plaintiff could establish a *prima facie* case, the defendants have countered with a legitimate, non-discriminatory reason for her termination of employment. The defendants argue that the plaintiff's position was eliminated due to economic concerns and because it was the least essential to the company. The plaintiff states that Vanvick and Marshall told her that her employment was being terminated due to bad business conditions. She also states that Marshall told her that she needed to have scored at least a 96 on her most recent performance evaluation (she scored a 92) to avoid being fired, and Vanvick told her that her position had only been temporary (pl. aff. ¶ 18).

The plaintiff argues that the "shifting and additional reasons" given by the defendants for her termination is "sufficient evidence of pretext" (pl. resp. BCCI m.s.j. 17-18) (citing *Halperin v. Abacus Technology Corp.*, 128 F.3d 191, 202 (4th Cir. 1997); *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001); *Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 646047 (4th Cir. 2002)). Specifically, she argues that the defendants no longer claim the plaintiff's termination had anything to do with her final performance evaluation score, and the following additional reasons have been brought forth by the defendants that were not at issue at the time of the plaintiff's termination in March 2003: (1) the plaintiff's duties could be more easily absorbed by other employees; (2) it was most efficient to eliminate the plaintiff's position; and (3) moving the plaintiff into another employee's position was not a viable option because such a move would require training the plaintiff to perform that job (pl. resp. BCCI m.s.j. 18).

The defendants argue that the plaintiff's final performance evaluation score had nothing to do with her termination, and it is possible that the plaintiff "was confused by the fact that Vanvick actually raised her score of 92 to a score of 96 for the purpose of giving her a larger bonus" (BCCI reply 9, ex. I). The defendants argue that this dispute of

14

fact is not material since all the parties admit that Vanvick and Marshall told the plaintiff that she was being terminated for economic reasons and that she had done a good job as an employee (pl. dep. 48-49, 210; pl. aff. ¶ 18).  This court agrees.

With regard to the "additional reasons" noted by the plaintiff, the defendants note that those reasons were set forth in response to an interrogatory from the plaintiff that asked why the plaintiff was selected for termination *rather than certain of her co-workers* (BCCI reply 10; pl. resp. BCCI m.s.j., ex. 13 at 5-6).  In response, the defendants stated that the impetus for the decision to eliminate a position was "profitability issues," and thus Vanvick reviewed several positions to determine whether a position could be eliminated. The defendants stated that the plaintiff's position was selected because it had only recently been created; the plaintiff's duties could be more easily absorbed by other employees; it was most efficient to eliminate the plaintiff's position; and moving the plaintiff into another employee's position was not a viable option because such a move would require training the plaintiff to perform that job.  *Id.*

The plaintiff next argues that the defendants' failure to follow their own layoff policy in terminating the plaintiff's employment is evidence of pretext.  The policy provides in relevant part as follows:  "Layoffs may be by affected unit, section, department or companywide.  The order of layoff is determined by the company, but in most cases it will be determined by performance and seniority." (BCCI reply, ex. C).  The plaintiff argues that the layoff policy was not followed in that Vanvick clearly testified that neither the plaintiff's performance nor her seniority were considered in deciding to lay her off and that the four steps contained in the layoff policy were not followed (Vanvick dep. 60-65).

The defendants counter that the layoff policy clearly states that the order of layoff determination is up to the discretion of the company and specifically notes that performance and seniority are not the determinative factors in every decision (BCCI reply 5).  The defendants further argue that even if the layoff policy applied here and was

15

construed to require mandatory comparisons based upon seniority and job performance, it would not have resulted in Clark being chosen for layoff rather than the plaintiff because the two employees were in different jobs under different supervisors and therefore were not comparable (BCCI reply 5-6).

It is the plaintiff's burden to create an inference that the defendants' proffered reason is a pretext for intentional discrimination. Based upon the foregoing, this court finds that the plaintiff has not and cannot meet her burden. Accordingly, summary judgment should be granted on the race discrimination claim.

### *Retaliation*

The plaintiff next alleges that she was terminated from employment in retaliation for her complaints of sexual harassment and racial discrimination in violation of Title VII and Section 1981. In order to establish a *prima facie* case of retaliation, the plaintiff must show that "'(1) she engaged in a protected activity; (2) the employer took adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action.'" *Matvia v. Bald Head Island Mgmnt.*, *Inc.,* 259 F.3d 261, 271 (4th Cir. 2001) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001)).

The defendants first argue that the plaintiff's claim with regard to retaliation for raising sexual harassment allegations was not raised in the plaintiff's Charge of Discrimination with the EEOC and thus cannot be raised here (BCCI m.s.j. 26 n. 6) (citing *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996). The plaintiff does not address this argument. However, as pointed out by the defendants, even if the claim could be raised, the plaintiff's complaint about sexual harassment (e-mail dated February 19, 2003) came *after* the decision to terminate her employment was made (decision to terminate noted on form dated February 15, 2003), and thus the plaintiff cannot meet the causation element of a *prima facie* case of retaliation based upon her sexual harassment complaint (BCCI reply

16

10 n. 5; BCCI m.s.j., ex. H, T).  *See Causey v. Balog*, 162 F.3d 795, 803-804 (4th Cir. 1998) (proof of causation requires proof that the decisionmaker had knowledge of the protected activity at the time adverse action was taken).  Accordingly, this claim fails.

The plaintiff notified Bill Michel by e-mail on February 19, 2003, that she was "being harassed by a black girl that works here and her cousin which does not work for Bonitz" (BCCI m.s.j., ex. H).  According to the plaintiff, she "specifically told Michel that Defendants' failure to discipline Clark for her role in the harassment was motivated by the fact that she was African-American rather than Caucasian and that such reasons for Defendants' lack of action were unlawful" (pl. resp. BCCI m.s.j. 14).  Assuming the plaintiff's complaint qualifies as protected activity, she cannot meet the causation element.  As discussed above, the evidence is undisputed that Vanvick signed off on a payroll form on February 15, 2003, noting that the plaintiff's position would be "phased out" due to a low backlog of work (BCCI m.s.j., ex. T), which was before the plaintiff complained to Michel about Clark and her cousin.  Thus, the plaintiff cannot show that Vanvick knew that she was purporting to exercise her Title VII rights at the time he decided to eliminate her position.  Accordingly, the retaliation claims fail.

### *Fair Labor Standards Act*

Lastly, the plaintiff alleges that she is entitled to back pay under the Fair Labor Standards Act ("FLSA") because she worked hours in excess of 40 hours per week but was not paid for such overtime hours.  The defendants did not keep time cards because the plaintiff was treated as salaried.  The defendants concede that their belief that her salary arrangement operated to make her exempt from the overtime requirements of the FLSA was erroneous (BCCI m.s.j. 29).

To recover under the FLSA, a plaintiff must show that she worked overtime hours without compensation and show the amount and extent of overtime hours she worked

as a matter of just and reasonable inference. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). The Fourth Circuit Court of Appeals' case law interpreting the Act also requires that the plaintiff show the defendants had knowledge, either actual or constructive, of her overtime work. *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986). If the employee carries her burden, the burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer cannot produce such evidence, the court may then award damages to the employee, even thought the result be only approximate. *Anderson*, 328 U.S. at 687-88.

The plaintiff's normal hours were from 8:00 a.m. until 5:30 p.m. from Monday through Thursday and from 8:00 a.m. until 2:00 p.m. on Friday, and she usually took a full hour for lunch (pl. dep. 88-92). Thus, in a typical week, she would work 39 hours. The plaintiff testified in her deposition that "toward the end of the month" she would get new projects that she would have to complete by the end of the month, which would require her to stay late and/or work through lunch. She specifically remembered two days in one week where she came in at 8:00 a.m. and worked until 7:00 p.m. with no lunch, and the next day she came in at 7:00 a.m. and worked until 5:30 p.m. with no lunch (pl. dep. 91-92).

The plaintiff's office was directly across from her supervisor's office (Marshall dep. 14). Marshall testified that the plaintiff complained to him one time that she was having to work overtime because other employees were giving her new projects to set up so late in the month (Marshall dep. 10, 14). Marshall further testified that he saw the plaintiff work beyond her regularly scheduled work hours on one occasion (Marshall dep. 13). Based upon the foregoing, it appears to this court that the evidence is sufficient to create a question of fact for a jury. Accordingly, summary judgment should be denied on this claim.

**CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the defendants' motions for summary judgment be granted in part and denied in part, as set forth herein.

s/William M. Catoe<br>
United States Magistrate Judge

February 21, 2006

Greenville, South Carolina